IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.   10-cv-00580-WYD-MJW

SEAN SUMPTER;
KYLE SUMPTER;
GEORGE SUMPTER; and
KATHIE SUMPTER;

> Plaintiffs,

v.

NATHAN AHLBRECHT, individually and in his capacity as an Investigator and
    Employee of the Elbert County Sheriff's Office;
WILLIAM FRANGIS, individually and in his capacity as an Employee of the Elbert
    County Sheriff's Office;
ROBERT PETERSON, individually and in his capacity as an Employee of the Elbert
    County Sheriff's Office;
DOUG DIXON, individually and in his capacity as an Employee of the Elbert County
    Sheriff's Office;
SHAYNE HEAP, individually and in his capacity as an Employee of the Elbert County
    Sheriff's Office;
MICHELLE NAIL, individually and in her capacity as an Employee of the Elbert County
    Sheriff's Office;
ELBERT COUNTY SHERIFF'S OFFICE; and
ELBERT COUNTY;

> Defendants.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

THIS MATTER is before the Court on the following motions: (1) Defendants Frangis,

Peterson, Dixon, Heap, Mattive[1], Elbert County Sheriff's Office and Elbert County's

---

[1] Lt. Michelle Nail changed her last name from Mattive after the commencement of this suit.  Defendants'
Motion refers to her as "Mattive."  On October 6, 2011, United States Magistrate Judge Michael J.
Watanabe granted Plaintiffs' motion to change the case caption to reflect the new name of Lt. Nail.  (ECF
No. 100.)  Given Lt. Nail's name change in the caption, this Order will refer to her as Lt. Nail.

Motion for Summary Judgment (ECF No. 70), filed August 8, 2011 and (2) Defendant

Nathan Albrecht's [sic] Motion for Summary Judgment (ECF No. 68), filed August 8,

2011.  Plaintiffs' Responses to the motions (ECF Nos. 88 and 89) were filed on August

31, 2011, and Defendants filed their Replies (ECF Nos. 92 and 93) on September 19,

2011.  After carefully considering the pleadings, I find that both motions for summary

judgment should be granted in part and denied in part.

II.    BACKGROUND / RELEVANT FACTS

       Charges and Investigation

       On August 11, 2008, C.D., a sixteen-year-old minor, reported that she had been

sexually assaulted by Sean Sumpter ("Sean"), age 17, and Kyle Sumpter ("Kyle"), age

15, at her residence in Elbert County, Colorado.  At Memorial Central Hospital, C.D.

was examined by a Sexual Assault Nurse Examiner to collect physical evidence.  The

hospital notified the Elbert County Sheriff's Office ("Sheriff's Office"), and Investigator

Nathan Ahlbrecht responded.  While at the hospital, Investigator Ahlbrecht met with

C.D. and interviewed C.D.'s boyfriend, C.D.'s boyfriend's mother, and C.D.'s

grandmother.

       The following day, C.D. gave a videotaped interview with Investigator Ahlbrecht

and his superior, Lt. Michelle Nail.  C.D. stated that both Sean and Kyle had subjected

her to sexual penetration against her will at approximately 5:30 p.m. on August 11, 2008

and that Sean threatened to "kick her ass" if she told anyone about the assault.  (Aff. of

Probable Cause, Ex. B at 2, ECF No. 72-2.)

       Based on C.D.'s statement that she had received various calls from the Sumpter

residence, Investigator Ahlbrecht and Lt. Nail had C.D. make a pretext phone call to

Sean on August 14, 2008.  The Officers were informed that Sean was unavailable because he was at football practice until 6:00 p.m.  Later that evening, Investigator Ahlbrecht called George Sumpter ("Mr. Sumpter"), Sean and Kyle's father, told him that there were allegations against his sons, and asked him to bring them in for an interview. Mr. Sumpter refused to do so without knowing the nature of the allegations, but Investigator Ahlbrecht said he would disclose that information only when the teens came to give an interview.  The conversation ended and Mr. Sumpter did not take Sean and Kyle to the Sheriff's Office.  The following morning, August 15, 2008, Mr. Sumpter called Ahlbrecht and stated that he would bring in his sons for the requested interview without any contingencies.[2]  Investigator Ahlbrecht told Mr. Sumpter that doing so was not necessary because the Sheriff's Office had moved on to "bigger and better things." (Aff. of George Sumpter, Ex. 1 ¶ 5, ECF No. 78-1.)

Also on August 15, 2008, Investigator Ahlbrecht gave the district attorney's office an affidavit of probable cause to arrest Sean and Kyle on charges of sexual assault, first degree burglary, second degree criminal trespassing, false imprisonment, and assault in the third degree.  That same day, the Elbert County District Court issued arrest warrants for Sean and Kyle.

Prior to the events in question, the Sheriff's Office had two previous encounters with the Sumpter family.  In 2007, Mrs. Sumpter called 9-1-1 because Mr. Sumpter threatened to commit suicide, and she informed Sheriff's Office deputies that there were several guns in the house.  In January 2008, Mrs. Sumpter called the police for help

---

[2] In their "Response Concerning Disputed Facts #28," Defendants dispute that this call was ever made, but state that "for purposes of their Motion for Summary Judgment, Defendants accept the allegations in SOF #27 as true."  (Reply 7.)  I presume that this numerical discrepancy is a typographical error and that Defendants do indeed accept Plaintiffs' Statement of Additional Disputed Facts #28 as true for purposes of this Order.

with Sean because she was afraid that he might hurt Kyle and because he punched a hole in the wall, pushed her into a wall, and said he could kill her.[3]  These events led to Sean's arrest for criminal mischief and harassment.  In a letter to the sentencing judge regarding the January 2008 event,[4] Mrs. Sumpter explained that she was writing because "if Sean heard me saying these things he wouldn't rest until he hunted me down and killed me," and she concluded that the judge "would be signing our death sentence" if Sean were sent home.  (Ex. C at 1, 3, ECF No. 72-3.)  Plaintiffs argue that there is no evidence that Lt. Nail actually saw the letter or court documents relating to the January 2008 incident.

Sean's Arrest

On August 15, 2008, Investigator Ahlbrecht went to execute the arrest warrants at the Sumpter residence with the assistance of Sgt. Robert Peterson, Deputy Doug Dixon, and then-Sheriff Bill Frangis.  Plaintiffs allege that other Officers were present as well, including Defendant Heap.  Sean and Mrs. Sumpter were the only individuals home when the Officers arrived.  With Sheriff Frangis at the back door, Investigator Ahlbrecht knocked at the front door and announced the Officers' presence.  Sean heard the Officers announce themselves, whereas Mrs. Sumpter thought that the bump at the front door was her horse.  Rather than answer the door, Sean went to the laundry room[5]

---

[3] Plaintiffs dispute this series of events.  However, in her deposition Mrs. Sumpter states, "I was afraid that [Sean] would be able to get through to [K.S.];" "[Sean] slammed me against the door jamb;" and "[Sean] said . . . I could kill you, and they would never find you in time[.]"  (Mrs. Sumpter Depo., Ex. D, at 31:13-14, 31:4-5, 53:1-2, ECF No. 72-4.)  In his deposition, Sean states that he punched a hole in the wall during the altercation with his mother and K.S.  [Kyle].  (Sean Depo., Ex. I, at 24:16, ECF No. 72-9.)
[4] Plaintiffs deny all of Defendants' allegations regarding this letter.  However, Plaintiffs offer no reason to doubt the veracity of the letter.
[5] In his deposition, Sean stated, "I was honestly not trying to hide, but I wasn't trying to be seen by a cop." (Ex. I at 76:18-20.)

while Mrs. Sumpter went to the bathroom on the other side of the house.  The Officers

then went to the back door, knocked, and again announced their presence.

Neither Sean nor Mrs. Sumpter opened the back door, and after a few minutes

the Officers entered the house.  At least three of the Officers had their weapons drawn.

The Officers called for Sean and Kyle to come out, but Sean remained in the laundry

room until the Officers came around the corner and saw him.[6]  When Sean first

emerged from behind the laundry room door, Investigator Ahlbrecht aimed his weapon

at Sean.  Defendants claim that Investigator Ahlbrecht immediately lowered his weapon

when he saw that Sean was unarmed, and that no other officers pointed their weapons

at Sean.  Plaintiffs claim that various officers, including Investigator Ahlbrecht, Deputy

Dixon, and Officer Heap, aimed their firearms at Sean when he emerged from the

laundry room.

At this point, Sean did not offer any resistance to the arrest, though the parties

dispute the manner in which Sean was handcuffed.  Sean states in his deposition that

the Officers "did a little move" to push him to the floor on his face, and then put a boot

on his back while handcuffing him.[7]  (Ex. I at 82:4.)  Defendants allege that Sean

complied with an order to lie down and that Sgt. Peterson then handcuffed him with

either a boot or a knee on his back.  At this time, Mrs. Sumpter emerged from the

bathroom and saw her son on the ground surrounded by the Officers.  Plaintiffs claim

that the Officers were yelling at Sean while he was handcuffed, attempting to elicit

---

[6] Plaintiffs dispute the allegation that Sean did not come out.  However, in his deposition, Sean states that
he "didn't come out" when he heard the Officers calling him.  (Ex. I at 31:5-9.)  Instead, the Officers
eventually came around the corner and saw him.  (*Id.*)  Investigator Ahlbrecht reports that Sean did come
out of the laundry room after being ordered to do so by two Officers.  (Ahlbrecht Depo., Ex. A, at 23:14-
16, ECF No. 72-1.)
[7] In the words of Plaintiffs' counsel, Sean "was swung in a circle and slammed into the ground on his
face" and Officer Peterson then "jammed his boot or other hard object . . . into Sean Sumpter's neck
area."  (Resp. 5-6.)

information from him, and that Investigator Ahlbrecht, Deputy Dixon, and Officer Heap aimed their firearms at him while he was on the ground.

Sean was subsequently transported to the Elbert County jail.  On August 16, 2008, Kyle turned himself into the Sheriff's Office, where he was arrested without incident.  Sean was incarcerated for twenty-five days, and Kyle was incarcerated for twenty-four days.

Post Arrest

Shortly after Sean and Kyle were arrested, Mrs. Sumpter typed formed alibi statements stating in full:

> To Whom It May Concern:
>
> On August 11, 2008, at 7:30 p.m., I personally observed Sean Sumpter at football practice at Calhan High School. He was being picked up by his father and older brother. They were in a blue pickup truck.

(Ex. K, ECF No. 72-11.)  Mrs. Sumpter appears to have added the handwritten note "This was Monday the first day of football camp" on many of the statements before they were signed.  (Ex. K.)  Several individuals signed the statements between August 19 and August 21, 2008, and some of the individuals modified the statement with handwritten explanations.  Mrs. Sumpter alleges that she gave the alibi statements to the deputy district attorney on August 22, 2008, though it is unclear what the deputy did with the statements.  Investigator Ahlbrecht and Lt. Nail claim that they did not receive the alibi statements from the deputy district attorney until months later.[8]

On August 20, 2008, Investigator Ahlbrecht submitted a second round of affidavits of probable cause.  On August 29, 2008, Investigator Ahlbrecht, at the request

---

[8] Plaintiffs dispute this claim, contending that the Officers should have known about the statements immediately after they were given to the deputy district attorney.

of the district attorney's office, prepared and signed an affidavit of probable cause for nontestimonial identification.  After the court had granted the district attorney's motion for nontestimonial evidence, buccal swabs and saliva samples were taken from Sean and Kyle, and photographs of Sean's pubic area were taken.

At a preliminary hearing on November 20, 2008, C.D. testified that the alleged sexual assault occurred around 2:00 p.m., contradicting her prior statements that the assault had occurred at 5:30 p.m.  Also at the hearing, Sean's football coach testified that Sean was at football practice from 5:00 p.m. to 6:45 p.m. on the date of the alleged assault.  The district attorney assigned an investigator to follow up on C.D.'s allegations, and C.D. eventually admitted that she falsified her allegations against Sean and Kyle. The criminal cases against Sean and Kyle were dismissed on March 12, 2009.

Elbert County Sheriff's Office Hierarchy and Policies

Investigator Ahlbrecht was the lead investigator in the Sumpter investigation in August 2008.  Lt. Nail was Investigator Ahlbrecht's direct supervisor at the time, and Defendant Frangis was the Sheriff for Elbert County.  As Sheriff, he was at the top of the Office's chain of command.

According to the Sheriff's Office Policy and Procedure Manual, supervisors are responsible for the work and conduct of subordinate personnel.  Under the "Use of Rifles" section of the Manual, Sheriff's Office policy 18-1 states that officers "shall exhaust every reasonable means of apprehension before resorting to use of firearms." (Ex. 3 at 5, ECF No. 78-3.)  The Manual has no policies or procedures addressing the use of force on minors or the investigation of sexual crimes.

Defendants' Arguments Set Forth in the Motions For Summary Judgment

Based on the foregoing events, Defendants' Motions for Summary Judgment raise the following arguments: (1) Defendants Ahlbrecht, Peterson, Dixon, Heap, and Frangis are entitled to qualified immunity from Plaintiffs' Fourth Amendment excessive force claim; (2) Due to the existence of probable cause, Ahlbrecht is entitled to qualified immunity from Plaintiffs' malicious prosecution and unlawful search and seizure claims; (3) Plaintiffs' malicious prosecution claim fails against all Defendants due to the existence of probable cause; (4) Defendants Ahlbrecht, Peterson, Dixon, Heap, and Frangis have governmental immunity from Sean's state tort claims; (5) Ahlbrecht is entitled to qualified immunity from Plaintiffs' due process claim; (6) Ahlbrecht is entitled to summary judgment on Sean's assault and battery claim; (7) no evidence supports a failure to train claim; and (8) no evidence shows that the Defendants intended to interfere with Mr. and Mrs. Sumpter's relationship with Sean and Kyle.

With respect to argument (1), Defendants urge me to disregard portions of Mrs. Sumpter's affidavit under the sham affidavit rule.  I will address each argument in turn.

III.   STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Equal Emp't Opportunity Comm. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  "When applying this standard, [the Court must] view the

evidence and draw all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation marks and citation omitted). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir. 1991).

IV.    ANALYSIS

A.    Whether Portions of Mrs. Sumpter's Affidavit Should Be Disregarded

As an initial matter, Defendants urge me to disregard portions of the affidavit Mrs. Sumpter submitted in support of Plaintiffs' Response.  Defendants argue that the statement in the affidavit that "Ahlbrecht, Heap, Dixon [sic] had their guns aimed at Sean, while Sean was on the ground, handcuffed" should be disregarded because it contradicts her deposition testimony.  (*See* Aff. of Kathleen Sumpter, Ex. 2 ¶ 5, ECF. No. 78-2.)  Defendant Ahlbrecht also argues that the affidavit contradicts Mrs. Sumpter's deposition testimony on the following points: (1) whether Mr. Sumpter agreed to take Sean and Kyle to the Sheriff's Office on August 15, 2008 without contingency; (2) Mrs. Sumpter's recollection of events surrounding when the Officers knocked on her door; and (3) the date when Mrs. Sumpter gave the typed alibi statements to the deputy district attorney.

An affidavit should not be disregarded solely because it conflicts with the affiant's prior sworn statements; rather, courts should "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  To determine whether an

affidavit creates a sham fact issue, courts "consider whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" *Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)).

For an affidavit to be disregarded under this rule, there must be a contradiction or inconsistency between the affidavit and the prior sworn statements. *See id.* The Tenth Circuit has upheld trial court decisions to disregard affidavits where a direct contradiction is obvious. *See, e.g.*, *Ralston*, 275 F.3d at 971-72 (finding a number of "material contradictions" between deposition testimony and subsequent affidavits); *Rios v. Bigler*, 67 F.3d 1543, 1552 (10th Cir. 1995) (finding that the deposition testimony was "unequivocal"). Some courts have required a direct contradiction to trigger the rule. *See, e.g.*, *Bausman v. Interstate Brands Corp.*, 50 F. Supp. 2d 1028, 1031 (D. Kan. 1999) (requiring an "irreconcilable conflict"), *rev'd on other grounds*, 252 F.3d 1111 (10th Cir. 2001); *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009) (stating that Ninth Circuit case law requires that an inconsistency be "clear and unambiguous to justify striking the affidavit"). In contrast, the Tenth Circuit has also upheld trial court decisions to disregard affidavits where the contradiction with prior sworn statements is less direct. *Michael v. Intracorp, Inc.*, 179 F.3d 847, 854-55 (10th Cir. 1999) (finding no abuse of discretion where trial court disregarded an affidavit after a party "arguably contradicted his deposition . . . or at least more clearly recalled [relevant information]"); *see also Juarez v. Utah*, 263 F. App'x 726, 735 (10th Cir. 2008)

(finding no abuse of discretion where trial court disregarded an affidavit that "did not directly contradict" deposition testimony).  Thus, under Tenth Circuit law, a contradiction between an affidavit and prior sworn statements need not be direct to justify disregarding the affidavit.  *Michael*, 179 F.3d at 854-55.

I begin by analyzing the extent to which Mrs. Sumpter's affidavit contradicts her deposition testimony.

### 1.   Whether Officers Aimed Their Firearms at Sean Once He Was Handcuffed

Mrs. Sumpter's affidavit states that Defendants Ahlbrecht, Heap, and Dixon were pointing their guns at Sean while he was handcuffed on the ground and crying hysterically.  In contrast, in her deposition Mrs. Sumpter never states that Officers Heap and Dixon pointed their guns at Sean.  Yet her deposition testimony regarding whether Officers Heap and Dixon aimed their guns at Sean is far from clear.  When asked whether Officer Heap had his gun pointed at the ground, Mrs. Sumpter stated, "I think . . . everybody had [their guns at] pretty much your normal level you would hold a gun[.]" (Kathleen Sumpter Depo., Ex. U at 139:19-21, ECF No. 93-2.)  Then asked to clarify the meaning of "normal level," she explained "[e]ven with your waist, maybe."  (*Id.* at 139:23.)  Again asked to clarify, she stated, "I couldn't say exactly the angle.  I would say, you know, in the guarded position[.]"  (*Id.* at 140:2-3.)  Opposing counsel then asked, "But it was pointed towards the floor, regardless of the angle, or was it pointed at a person?", and she responded, "I wouldn't say, pointed at the floor.[9]  I would say -- the

---

[9] I note that this description is somewhat similar to the description Mrs. Sumpter gave of how Investigator Ahlbrecht held his gun.  When asked whether he pointed his gun at her, she responded unequivocally, "No, no.  At Sean." (Ex. U at 71:13.)  Then asked whether the gun was pointing down towards the floor, she stated, "Well, there's several feet in between.  I wouldn't say he was pointing it at the floor, but at that direction."  (*Id.* at 71:18-20.)

best way I can describe it would be in a guarded position, I would say, probably to protect themselves." (*Id.* at 140:8-11.)  Similarly, Mrs. Sumpter later stated that Officer Dixon held his gun like Officer Heap in a "guarded position." (*Id.* at 141:17-20.)

Based on the foregoing, I am not persuaded that Mrs. Sumpter's affidavit directly contradicts or is even significantly inconsistent with her deposition.  At her deposition, opposing counsel never asked her directly whether Officers Heap and Dixon pointed their firearms at Sean while he was on the ground.  Although opposing counsel did ask, "But [Officer Heap's gun] was pointed towards the floor, regardless of the angle, or was it pointed at a person?" Mrs. Sumpter responded that it was not pointed at the floor and she never states it was *not* pointed at a person.  Opposing counsel asked a compound question, of which Mrs. Sumpter appears to have answered only the first part, and I cannot conclude to a significant level of certainty that she thereby intended to answer the second part in the negative.[10]  Additionally, I cannot determine with any level of certainty what the phrases "guarded position" and "your normal level you would hold a gun" mean, particularly when spoken by a person who appears to have no military, law enforcement, or other relevant firearm experience.  Both phrases could be construed to describe aiming a gun at a person or merely having one's gun drawn but not aiming at a particular person.  Accordingly, I conclude that Mrs. Sumpter's affidavit is not significantly inconsistent with her deposition.

Turning next to the three *Law Co.* factors, I find that the first two factors weigh heavily in Defendants' favor.  *See* 577 F.3d at 1169.  As to the first factor, Mrs. Sumpter was subject to cross-examination at her deposition.  *See id.*  As to the second factor,

---

[10] It is for this reason, among others, that compound questions are commonly objected to at trial.  *See, e.g.*, 81 Am. Jur. 2d *Witnesses* § 714 (2011).  Compound questions are inherently confusing.

Mrs. Sumpter had access to all the pertinent evidence at the time of her deposition.

*See id.*  The third factor, however, tends to support Plaintiffs' position.  As described in

the prior paragraph, Mrs. Sumpter's deposition testimony is unclear and is open to a

variety of interpretations, and her affidavit can thus be seen as an attempt to explain her

deposition testimony.  *See id.*

> 2. Whether Mr. Sumpter Agreed to Take Sean and Kyle to the
>    Sheriff's Office Without Contingency

In her affidavit, Mrs. Sumpter states that "[o]n August 15, 2008, at about 9:00 am

[sic] I witnessed my husband on the telephone with Deputy Ahlbrecht, volunteering to

bring in Sean and K.S. [Kyle] with no contingencies to the Sheriff's station."  (Aff. of

Kathleen Sumpter, Ex. 2 at ¶ 3, ECF No. 80-2.)  In her deposition, Mrs. Sumpter was

repeatedly asked whether Mr. Sumpter wanted to know what the issues were before

bringing Sean and Kyle to the Sheriff's station on August 15, 2008.  (Kathleen Sumpter

Depo., Ex. D at 65:1-13, ECF No. 69-4.)  She responded by stating, "I don't think he

did," "I can't say for 100 percent sure," and "No [I don't recall]."  (*Id.* at 65:3-12.)  Mrs.

Sumpter then stated, "I do know he just said, Are you ready for me to bring them

down?"  (*Id.* at 65:12-13.)

Thus, while Mrs. Sumpter did not clearly recall in her deposition whether Mr.

Sumpter wanted to know what the issues were before bringing in Sean and Kyle, her

deposition testimony is largely consistent with her later statement that Mr. Sumpter

offered to bring the boys in without contingency.  In her deposition, she did not think Mr.

Sumpter imposed a contingency and she remembered him asking whether the Sheriff's

Office was ready for him to bring in his sons.  Accordingly, I find no contradiction or

relevant inconsistency between Mrs. Sumpter's affidavit and her deposition testimony, and therefore find it unnecessary to analyze this point under the *Law Co.* factors.

> 3.   Mrs. Sumpter's Recollection of the Officers Knocking on Her Door

Regarding the time period when the Officers knocked on the front door of the Sumpter residence, Mrs. Sumpter's affidavit states, "I heard a noise and assumed it was our horse, who often bumped our door.  Sean and I looked at each other, and I went to the restroom."  (Ex. 2 at ¶ 5.)  In her deposition, she stated that "there was a pounding on the door.  And I was continuing on down the hallway, and [Sean] got up.  He said – I think he mouthed, What was that, or, Who is that, or something like that to me. . . . I go to the bathroom."  (Ex. D at 65:24 – 65:3.)  In response to Sean's question, Mrs. Sumpter gave a quizzical look.  (*Id.* at 66:8.)  Mrs. Sumpter also stated that she never heard the police announce themselves.  (*Id.* at 66:11.)

I find no contradiction or relevant inconsistency between Mrs. Sumpter's affidavit and her deposition testimony.  Both the affidavit and the deposition clearly communicate the idea that even though she heard sounds at her front door, Mrs. Sumpter did not hear the Officers announce themselves.  Defendants draw my attention to the difference between "a pounding on the door" and "a bump" (Reply 10), but I find the semantic difference between the phrases to be of limited importance.  Defendants also emphasize that Mrs. Sumpter's affidavit does not describe her communication with Sean through gesture, but I know of no authority requiring an affidavit to mirror deposition testimony in full.  Finally, Defendants highlight the fact that Mrs. Sumpter does not mention her horse in the deposition.  This omission appears to be nothing more than an oversight, and Defendants have not directed me to any part in the

deposition where opposing counsel asked Mrs. Sumpter what she believed caused the "pounding on the door."   Given the overall consistency between her affidavit and deposition, I find it unnecessary to analyze this issue under the *Law Co.* factors.

4.  The Date Mrs. Sumpter Gave the Typed Alibi Statements to the Deputy District Attorney

Again, I begin by turning to the extent to which Mrs. Sumpter's affidavit contradicts her deposition testimony.  Her affidavit states, "I have reviewed the court data access printout (Elbert 001151) subsequent to my deposition and recall that it was August 22, 2008 when I provided Deputy District Attorney Bailey signed alibi statements made by Sean Sumpter's coaches and other students from his school."  (Ex. 2 at ¶ 6.) In her deposition, Mrs. Sumpter could not remember the date she gave the signed alibi statements to the deputy district attorney.  She described the date as "[w]hatever the following court date was," "a Friday," and "[t]he very last letter I picked up, I picked up on my way to that court date.  So if that letter was dated, then that would help."  (Ex. D. at 86:12, 87:21, 88:22-25.)

Rather than directly contradict her deposition testimony, Mrs. Sumpter's affidavit clarifies a point she could not remember at her deposition.  Such clarification can rise to the level of creating a sham issue of fact.  *See Juarez*, 263 F. App'x at 734-36 (upholding decision to disregard affidavit that detailed racial slurs where affiant could not recall specific slurs during her deposition, reasoning that the timing of the affidavit placed defendant at a disadvantage).  Unlike in *Juarez*, however, the timing of Mrs. Sumpter's affidavit has not placed Defendants at a particular disadvantage.  Throughout the relevant portion of her deposition, Mrs. Sumpter appears to believe that the alibi statements were given to the deputy district attorney in the third or fourth week of

August.  After stating that she provided the alibi statements "[a]t the next court date,"

opposing counsel asked whether that was the preliminary hearing of August 19, 2008

and Mrs. Sumpter answered affirmatively.  (Ex. D. at 87:21 - 88:5.)  When given reason

to doubt that this date was correct, Mrs. Sumpter mentioned that the date of the last

alibi statement might help.  One alibi statement is dated August 28, 2008, and the rest

are dated from August 19 to August 21, 2008.  Thus, in her deposition Mrs. Sumpter

indicated that she provided the alibi statements *before* Ahlbrecht submitted his August

29, 2008 affidavit of probable cause.  Therefore, I find that Mrs. Sumpter's affidavit does

not directly contradict her deposition and Defendants have not been placed at a clear

disadvantage by the timing of the affidavit.

Moving on to the *Law Co.* factors, I find that the first two factors support

Defendants' position.  *See* 577 F.3d at 1169.  Mrs. Sumpter was available for cross-

examination by opposing counsel, and she had access to the pertinent evidence at the

time of the deposition.  *See id.*  However, the third factor strongly supports Plaintiffs.

*See id.*  Mrs. Sumpter's deposition testimony reflects confusion about a specific date

that the affidavit explains by stating that Mrs. Sumpter subsequently reviewed a "court

data access printout" and therefore could recall that she provided the alibi statements

on August 22, 2008.  *See id.*; (*see also* Ex. 2 at ¶ 6.)  Accordingly, I find that Mrs.

Sumpter's statement in her affidavit should not be disregarded.

Examining the four alleged contradictions as a whole, I conclude that Mrs.

Sumpter's affidavit should *not* be disregarded as a sham affidavit.  Although I recognize

that a direct contradiction is not required, I find that the Defendants have not pointed to

material differences between the affidavit and the deposition testimony that would justify

disregarding the affidavit.  In addition, the weight of the *Law Co.* factors does not point clearly in Defendants' favor.  In sum, I am not persuaded that Mrs. Sumpter's affidavit "constitutes an attempt to create a sham fact issue."  *See* 577 F.3d at 1169.

      B.     Plaintiffs' Fourth Amendment Excessive Force Claim

      Plaintiffs' assert a claim for relief based upon a violation of the 4th Amendment (Unlawful Search and Seizure and Excessive Force).  This claim is asserted against Defendants Ahlbrecht, Frangis, Peterson, Dixon, and Heap.

      "In civil rights actions seeking damages from governmental officials, those officials may raise the affirmative defense of qualified immunity, which protects all but the plainly incompetent or those who knowingly violate the law."  *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1185 (10th Cir. 2001) (internal quotations and citation omitted).  Once the affirmative defense is raised by a defendant, the burden shifts to the plaintiff to come forward with facts or allegations sufficient to show both "that the defendant's actions violated a constitutional or statutory right" and that the right "was clearly established at the time of the defendant's unlawful conduct."  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotations and citation omitted); *see also Workman v. Jordan*, 32 F.3d 475, 479 (10th Cir. 1994); *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996).

      Thus, in the context of a motion for summary judgment, I must first consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [officials'] conduct violated a constitutional right?"  *Holland*, 268 F.3d at 1185.  If I determine that there has been a violation of a constitutional right, then I must "ask whether the right was clearly established at the time of the defendant[s']

unlawful conduct." *Id.* at 1186 (internal quotations and citation omitted). If the plaintiff successfully establishes the violation of a clearly established right, the burden then shifts to the defendant, who must prove that there are no genuine issues of material fact and that the defendant is entitled to judgment as a matter of law. *Medina*, 252 F.3d at 1128; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

> 1.   Whether Defendants' Conduct Violated the Fourth Amendment

Turning to the first step in the qualified immunity inquiry, I must determine whether "the facts alleged show the [officials'] conduct violated a constitutional right[.]" *Holland*, 268 F.3d at 1185. "Claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment." *Medina*, 252 F.3d at 1131. The reasonableness inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations and citation omitted). The test of reasonableness also "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Thus, reasonableness is evaluated by examining the totality of the circumstances of a particular seizure. *Blossom v. Yarbrough*, 429 F.3d 963, 967 (10th Cir. 2005). Further, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In analyzing the reasonableness of Defendants' force, I must also consider, as an element of the totality of the

circumstances test, whether the Officers' own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Blossom*, 429 F.3d at 968 (quoting *Jiron v. City of Lakewood*, 392 F.3d 410, 415 (10th Cir. 2004)).

Turning to an analysis of the three *Graham* factors, the first factor—the severity of the crime—points strongly in Defendants' favor.  Sean and Kyle were accused of committing the violent felony of sexual assault, as well as first-degree burglary, second-degree criminal trespass, false imprisonment, and third-degree assault.  The second factor—whether Sean posed an immediate threat to the safety of the Officers or others—generally points in favor of Plaintiffs.  On the morning of the raid, Mr. Sumpter had offered to bring Sean and Kyle to the Sheriff's Office.[11]  Thus, although the Officers were aware of Sean's prior arrest and of the existence of guns in the house, the Officers should have also known that the Sumpter family was presumably willing to address the charges peaceably.  Nonetheless, the Officers rightfully became more careful upon seeing Sean retreat into an unknown room after they had knocked and announced themselves.  At this point during the arrest, with knowledge of both Sean's criminal

---

[11]        This raises the issue of whether the Officers' own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  The *Sevier* Court noted that "if the preceding events are merely negligent or if they are attenuated by time or intervening events, then they are not to be considered[.]" *Id.* at n.8.  The Tenth Circuit further clarified this rule by explaining that an "officer's conduct before the suspect threatens force is therefore relevant provided it is 'immediately connected' to the seizure and the threat of force[,]" and thus a court's primary inquiry "remains on whether the officer was in danger at the exact moment of the threat of force." *Medina*, 252 F.3d at 1132 (quoting *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997)).  Thus, events occurring one hour before a seizure are not considered in determining the reasonableness of a seizure. *Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994).  I accordingly find that in this case I cannot consider Investigator Ahlbrecht's rejection of Mr. Sumpter's offer as a distinct factor in determining the reasonableness of the seizure because the rejection occurred hours before the raid began.
        Nonetheless, I still consider the rejection to be relevant in two ways.  First, Mr. Sumpter's offer likely apprised the Officers that Sean was less of an immediate threat than his criminal history indicated. *See Graham*, 490 U.S. at 396.  Second, the test of reasonableness under the Fourth Amendment includes examining the "justification for initiating [an intrusion.]" *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  In this case, given Mr. Sumpter's offer to bring Sean and Kyle to the Sheriff's Office, I find that the justification for initiating a multi-officer raid on a private residence to arrest two teenagers is not as strong as it otherwise would be.

history and the probable existence of guns in the house, the Officers acted reasonably in drawing their firearms and proceeding with caution. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (stating that officers may take steps reasonably necessary to protect their personal safety). However, once Sean was handcuffed on the ground and thus no longer posed an immediate threat, Officers Ahlbrecht, Heap, and Dixon continued to aim their firearms at Sean. The third factor—whether Sean actively resisted arrest or fled—is inconclusive. Although Sean did not answer the door and went to the laundry room where he could not be seen, once the Officers saw Sean in the laundry room, he did not physically resist arrest and he never attempted to flee the residence.

Considering the record as a whole taken in the light most favorably to Plaintiffs, I conclude that Plaintiffs have sufficiently alleged a violation of Sean's Fourth Amendment rights. Although various aspects of the arrest may have been reasonable, the fact that Officers Ahlbrecht, Heap, and Dixon continued to point their weapons at a handcuffed minor is sufficient to show an objectively unreasonable seizure.[12] *See Holland*, 268 F.3d at 1192-93 (stating that it may be excessive and unreasonable to continue to aim a firearm at a person that has submitted to an officer's show of force, particularly if the person is a child). Accordingly, Plaintiffs have sufficiently alleged facts demonstrating that Defendants violated Sean's Fourth Amendment rights.[13]

---

[12] I also note that "unreasonable force claims are generally fact questions for the jury." *Buck v. City of Albuquerque*, 549 F.3d 1269, 1288 (10th Cir. 2008).

[13] Although I am cognizant that Sgt. Peterson is not alleged to have pointed his firearm at Sean or held supervisory responsibility for the arrest, I nonetheless find it inappropriate to address whether summary judgment on this claim is proper as to Sgt. Peterson. The parties have not addressed this issue in their briefing, and I note that "[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

2.    Whether Defendants Violated Clearly Established Law

Turning to the second prong of the qualified immunity analysis, I must determine whether Sean's Fourth Amendment right was clearly established at the time of the violation.  It is clearly established that the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  However, that is not enough.  "[T]he right the official is alleged to have violated must have been clearly established in a more particularized and . . . more relevant sense . . . ." *Id.* at 202 (internal quotations and citation omitted).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*  Generally, this means that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must be as plaintiff maintains." *Farmer v. Perrill*, 288 F.3d 1254, 1259 (10th Cir. 2002).

Plaintiffs direct the Court to two cases in attempting to show a violation of clearly established law.  In *Holland*, the Tenth Circuit declared:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.  Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. . . . Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use. Pointing a firearm directly at a child calls for even

> greater sensitivity to what may be justified or what may be excessive under all the circumstances.

268 F.3d at 1192-93.  The *Holland* Court found that holding children bystanders at gunpoint for several minutes after officers had gained control of the situation is unreasonable.  *Id.* at 1193.  In *Ealum v. Schirard*, the Tenth Circuit found that pointing a gun at a six-year-old and herding a grandmother and three children at gunpoint, with no indication they were a threat, constituted a violation of the Fourth Amendment.  46 F. App'x 587, 592 (10th Cir. 2002).

Defendants argue that the above cases are factually distinguishable from this case.  I find that although there are obvious factual variations, such variations do not signify that the law is *not* clearly established.  *See, e.g.*, *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (stating that plaintiffs are not required "to find a case with exact corresponding factual circumstances" because defendants must reasonably apply existing law to their own circumstances).  *Holland* clearly stands for the proposition that aiming a firearm at a person should be based on at least some perceived threat to officers or others, particularly where the firearm is pointed at a child.  268 F.3d at 1192-93.  In this case, Officers Ahlbrecht, Heap, and Dixon are alleged to have continued pointing their guns at Sean even though he was already handcuffed and no longer posed a threat, a show of force that a reasonable officer would have known transgressed legal boundaries.  *See Saucier*, 555 U.S. at 202.  Accordingly, I conclude that Sean's Fourth Amendment right was clearly established at the time of the seizure.

In sum, Plaintiffs have come forward with facts and allegations sufficient to show that (1) Defendants violated Sean's Fourth Amendment right and (2) Sean's Fourth Amendment right was clearly established.  Defendants are therefore not entitled to the

affirmative defense of qualified immunity, and summary judgment on Sean's excessive force claim is not appropriate at this time as there are genuine issues of material fact in dispute.

C.   Plaintiffs' Unlawful Search and Seizure Claim and Malicious Prosecution Claim[14]

Plaintiffs' assert a claim against Defendants Ahlbrecht and Nail for Unlawful Search and Seizure – Malicious Prosecution under 42 U.S.C. § 1983.

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and states that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.  A section 1983 malicious prosecution claim includes the following common law elements: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).  These elements are the starting point for a malicious prosecution analysis, and then the "ultimate question" is "whether the plaintiff has proven a *constitutional* violation." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996).  In the context of a § 1983 malicious prosecution action, "that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures." *Id.*

---

[14] Plaintiffs separate their unlawful search and seizure claim and their malicious prosecution claim. (Pls.' Second Am. Compl. 24, 28, ECF No. 35.)  Ahlbrecht believes that both claims would run together.  (Mot. 18.)  Plaintiffs do not appear to dispute this assertion.  In any event, the parties focus their briefing on whether probable cause existed.  As my finding on this issue determines the outcome of both the unlawful search and seizure claim and the malicious prosecution claim, I find it unnecessary to address whether both claims run together.

Regarding the absence of probable cause element, "it is a violation of the Fourth Amendment to knowingly, or with reckless disregard for the truth, include false statements in the affidavit outlining probable cause for an arrest," *Wilkins*, 528 F.3d at 805 (internal quotations and citation omitted), or to "knowingly or recklessly omit from the affidavit information which, if included, would have vitiated probable cause[.]" *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). "Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Id.* In cases where exculpatory evidence has been withheld, "the existence of probable cause is determined by examining the evidence 'as if the omitted information had been included' and inquiring whether probable cause existed in light of all the evidence, including the omitted information." *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004) (quoting *Wolford*, 78 F.3d at 489). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed . . . an offense." *Jones v. City and Cnty. of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988). Thus, law enforcement officials are entitled to immunity where they reasonably yet mistakenly conclude that probable cause is present. *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995). In a malicious prosecution action, supposing a plaintiff's alleged facts to be true, determination of probable cause is a question of law. *Miller v. Arbogast*, No. 11-2010, 2011 WL 5042516, at *5 (10th Cir. 2011) (citing *Rouse v. Burnham*, 51 F.2d 709, 712 (10th Cir. 1931)).

Defendants Ahlbrecht and Nail both argue that they are entitled to summary judgment on Plaintiffs' malicious prosecution claim because probable cause existed to arrest Sean and Kyle.  Plaintiffs respond that two events should have triggered an awareness in the Officers that Sean was at football practice at the time of the alleged rape: (1) the pretext phone call made to Sean on August 14, 2008, where Investigator Ahlbrecht and Lt. Nail learned that Sean was at football practice until 6:00 p.m. that day (thus presumably vitiating probable cause for the August 15 and August 20, 2008 affidavits), and (2) the deputy district attorney's receipt on August 22, 2008 of various alibi statements from Sean's coaches and other students (thus vitiating probable cause for the August 29, 2008 affidavit for nontestimonial identification).

I agree with Ahlbrecht and Nail.  Regarding the pretext phone call, I cannot conclude that the knowledge that Sean was at football practice during the afternoon three days after the alleged rape constitutes knowingly or recklessly including false statements—here, C.D.'s statements—in the first and second probable cause affidavits.[15]  *See Wolford*, 78 F.3d at 489.  Although one would have hoped that such knowledge would have raised the issue of an alibi in Investigator Ahlbrecht and Lt. Nail's minds, various inferential steps are required to conclude that Sean was at football practice during the alleged rape.  The Officers would have had to have known that football practice occurred at the same time every day in early August and that Sean actually attended football practice on August 11, 2008.  The Officers' failure to make these inferential steps may constitute negligence, but does not rise to the level of knowing or reckless behavior.

---

[15] Since the pretext phone call and the knowledge that Sean was at football practice until 6:00 p.m. on August 14, 2008 was included in the August 15, 2008 affidavit, I conclude that Investigator Ahlbrecht plainly did not omit material information from the affidavit.  *See Wolford*, 78 F.3d at 489.

Moreover, case law clearly supports Ahlbrecht and Nail's position.[16]  A police

officer's "failure to investigate . . . alleged alibi witnesses [does] not negate the probable

cause for [an] arrest in the absence of a showing that [the officer's] initial probable

cause determination was itself unreasonable." *Romero*, 45 F.3d at 1476;[17] *see also*

*United States v. Brown*, 234 F. App'x 838, 847 (10th Cir. 2007) (finding that officers'

failure to call a car rental company to check whether a car was in fact stolen did not

vitiate probable cause).  Thus, once a police officer has concluded that probable cause

exists, failure to question "alibi witnesses prior to [an] arrest [does] not negate probable

cause." *Romero*, 45 F.3d at 1476.  In this case, Plaintiffs have made no showing that

the original probable cause determination was unreasonable.  To the contrary,

Investigator Ahlbrecht and Lt. Nail had ample reason to believe that Sean and Kyle

committed the alleged rape: C.D. had positively identified both Sean and Kyle as her

assailants and had described the rape in detail, and C.D.'s grandmother had found C.D.

visibly upset shortly after the alleged sexual assault.  *See Jones*, 854 F.2d at 1210.

Police officers may determine probable cause based on a witness' statement.  *Munday*

*v. Johnson*, 257 F. App'x 126, 131 (10th Cir. 2007) (citing *Romero*, 45 F.3d at 1476);

---

[16] Plaintiffs have not directed me to any cases with analogous facts that support their position.  In their Response, they do quote their expert for the proposition that Defendants "failed to conduct a complete and objective criminal investigation of a sexual assault consistent with nationally accepted standards of police training and practice before making a precipitous arrest." (Resp. at 22.)  While this proposition may be true, it does not legally signify that Investigator Ahlbrecht and Lt. Nail did not have probable cause for the arrest.  Based on the Court's research, the overwhelming weight of authority supports Defendants' position.

[17] For purposes of the probable cause issue, the facts in *Romero* are analogous to those in this case.  In *Romero*, the plaintiff was arrested for murder based on interviews with two witnesses.  *Id.* at 1474.  After being taken in to custody, the plaintiff informed the arresting officer that three people could establish that he was asleep in bed during the murder.  *Id.*  The arresting officer did not interview plaintiff's alibi witnesses.  *Id.*  The *Romero* court found no case law to "support [plaintiff's] broad proposition that a police officer who interviews witnesses and concludes probable cause exists to arrest violates the Fourth Amendment by failing to investigate the [plaintiff's] alleged alibi witnesses.  Instead, the cases state that the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily *available at the scene*, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention." *Id.* at 1476-77 (emphasis added).

*see also Easton v. City of Boulder*, 776 F.2d 1441, 1448, 1450-51 (10th Cir. 1985) (finding that victim statements containing some inconsistencies were sufficient to establish probable cause).  "When examining informant evidence used to support a claim of probable cause . . . the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim[.]"  *Easton*, 776 F.2d at 1449.  Accordingly, Investigator Ahlbrecht and Lt. Nail properly relied on C.D.'s version of events to determine that probable cause existed.  For these reasons, Investigator Ahlbrecht and Lt. Nail's failure to explore the possibility that Sean had an alibi does not defeat a finding of probable cause for the August 15 and August 20, 2008 affidavits.

Moving on to the deputy district attorney's receipt on August 22, 2008 of the typed alibi statements, I again conclude that Investigator Ahlbrecht and Lt. Nail's failure to contact Sean's alibi witnesses does not constitute knowing or reckless behavior that would vitiate probable cause.  *See Wolford*, 78 F.3d at 489.  I begin by noting the time discrepancy between the typed alibis (which refer to seeing Sean at 7:30 p.m.) and when C.D. said the rape occurred (5:30 p.m.).  Even taking into account the handwritten notes that report seeing Sean around 6:30 p.m. or 6:45 p.m., the alibi statements do not directly contradict C.D.'s statements because of the time discrepancy of at least one hour.  Accordingly, although the Officers may have negligently failed to infer that Sean was most likely at football practice at 5:30 p.m. because a coach last saw Sean at 6:45 p.m. after "let[ting] him into the locker room" (Ex. K at 6), I find that such failure does not rise to the level of knowingly or recklessly omitting relevant information or including false information in the August 29, 2008 affidavit.  *See, e.g.*, *Romero*, 45 F.3d at 1479

(holding that officers' failure to investigate alibi witnesses after an arrest "simply does not exceed negligence"); *Lee v. Geiger*, 419 So.2d 717, 719 (Fla. Dist. Ct. App. 1982) (finding that a failure to investigate a 4:00 a.m. alibi for a sexual battery that allegedly occurred at 3:00 a.m. "is not a sufficient basis for a recovery in a malicious prosecution . . . action"); *Brown v. City of New York*, 92 A.D.2d 15, 18 (N.Y. App. Div. 1983) (stating that the "assertion of an alibi, and even the failure to investigate such an alibi to plaintiff's satisfaction, does not overcome the existence of probable cause to prosecute").

Even assuming that the alibi statements were knowingly or recklessly omitted from the August 29, 2008 affidavit, I would still have to evaluate whether probable cause existed had the omitted information been included in the affidavit. *Pierce*, 359 F.3d at 1293. I conclude that probable cause would still have existed even if the affidavit included the alibi statements. Because of the time discrepancy, Investigator Ahlbrecht and Lt. Nail were not confronted with evidence that directly called into question C.D.'s statements. *See Miller*, 2011 WL 5042516, at *5 (concluding that, in a malicious prosecution action, where a plaintiff's alibi does not cover the entire time period of the alleged crime, the alibi does not vitiate probable cause); *see also Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007) (concluding that even where an alibi is offered, "the surviving witness's identification of Plaintiff established an objectively reasonable basis for a finding of probable cause," and that evidence of plaintiff's whereabouts on the night of the crime would be weighed carefully at trial).

Accordingly, I find that probable cause existed for the three affidavits Investigator Ahlbrecht submitted. Because there was probable cause, Ahlbrecht is entitled to

summary judgment on Sean and Kyle's unlawful search and seizure claim.  Further, as the absence of probable cause is a necessary element in a malicious prosecution claim, *Wilkins*, 528 F.3d at 799, Ahlbrecht and Nail are entitled to summary judgment on Sean and Kyle's malicious prosecution claim.

      D.    Plaintiffs' State Law Tort Claims

Plaintiffs assert claims of intentional infliction of emotional distress and assault against Defendants Ahlbrecht, Frangis, Peterson, Dixon, and Heap.  Plaintiffs also assert claims of abuse of process and false imprisonment against Defendant Ahlbrecht. Plaintiffs further assert a claim of battery against Defendants Ahlbrecht and Peterson.

      1.    Governmental Immunity from State Law Claims

The Colorado Governmental Immunity Act ("CGIA") governs circumstances under which a person may maintain a tort action against the State of Colorado, its political subdivisions, instrumentalities, and employees.  *See Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.3d 1200, 1203 (Colo. 2000).  The CGIA provides that public entities are immune from all claims that lie or could lie in tort, unless the claim falls within one of the eight limited areas for which immunity has been waived.  *See* Colo. Rev. Stat. § 24-10-105-106.

The CGIA also provides similar immunity to public employees.  However, public employees are not immune from tort claims if their acts or omissions causing the injury were willful and wanton.  Colo. Rev. Stat. § 24-10-118.  The CGIA defines "public employee" to include officers and employees of public entities.  Thus, I find that Defendants Ahlbrecht, Frangis, Peterson, Dixon, and Heap are public employees within the meaning of the CGIA.  *See* Colo. Rev. Stat. § 24-10-103(4)(a).

Although the CGIA does not define the term "willful and wanton," the Colorado Supreme Court looked to the definition of "willful and wanton" for purposes of exemplary damages ("conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff") and the definition of "willful and wanton" used in the automobile guest statute ("wholly disregardful of the rights, feelings and safety of others . . . at times even imply[ing] an element of evil"). *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994) (quotations and citations omitted).

Defendants Frangis, Peterson, Dixon, and Heap

These Defendants argue that there is simply no evidence to support a finding that Officers Frangis, Peterson, Dixon, and Heap engaged in willful and wanton conduct.  In response, Plaintiffs contend that both the handcuffing of Sean and the continued aiming of firearms at Sean constituted willful and wanton behavior.  With respect to the handcuffing of Sean, I conclude that the evidence before the Court is insufficient to support a finding of willful and wanton conduct.  Sean described being handcuffed by Sgt. Peterson as being "pushed" or "put" on the floor on his face with a boot on his back.  (Ex. I at 82:2-5.)  He also described being "swung in a circle" on his belly.  (Ex. I at 82:11-12.)  Sean stated that he received no injuries or bruises from the handcuffing.  This series of events, even taken in the light most favorable to the Plaintiffs, simply does not rise to the level of purposeful conduct done "heedlessly and recklessly, without regard to consequences[.]"  *See Moody*, 885 P.2d at 205.  Sgt. Peterson had ample reason to believe that some physical force was appropriate: Sean was suspected of committing a violent felony, he had a known history of violence and

was a high school football player, guns were known to be in the house, and he had apparently attempted to hide from the officers.  Thus, the physical force Sgt. Peterson applied was reasonably necessary to ensure that Sean was handcuffed quickly and in a manner that would minimize the risk posed to the officers.  *See Graham*, 490 U.S. at 396 ("the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it").  Accordingly, the manner in which Sean was handcuffed cannot be the basis to overcome governmental immunity under the CGIA.

Continuing to aim firearms at Sean once he was handcuffed, however, could be considered willful and wanton.  Once handcuffed and on the ground, Sean was clearly no longer a threat, yet Officers Ahlbrecht, Dixon, and Heap are alleged to have continued aiming their weapons at him.  Such conduct could be considered "wholly disregardful of the rights, feelings and safety of others," *see Moody*, 885 P.2d at 205, particularly as Sean was still a minor at the time.  Accordingly, Plaintiffs have offered sufficient evidence to support a finding of willful and wanton conduct on the part of Defendants, and thus Defendants are not entitled to governmental immunity under the CGIA.  *See* Colo. Rev. Stat. § 24-10-118(1).  For this reason, summary judgment in favor of Defendants based on governmental immunity is not appropriate for Plaintiffs' tort claims.[18]

---

[18] Defendants Frangis, Peterson, Dixon, and Heap's Motion addresses only the issue of governmental immunity pursuant to the CGIA, and therefore I am unwilling to address whether these individual Defendants are entitled to summary judgment or whether individual tort claims are subject to summary judgment.  I nonetheless note that, on the evidence before me, neither Sgt. Peterson nor Sheriff Frangis is alleged to have engaged in conduct that could be classified as willful and wanton.  I also note that Plaintiffs' battery claim appears to lack evidentiary foundation in the record.

<u>Defendant Ahlbrecht</u>

Ahlbrecht argues that there that there is simply no evidence to support a finding that he engaged in willful and wanton conduct.  In response, Plaintiffs contend that Ahlbrecht withheld information from his affidavits of probable cause, launched an unnecessary raid to arrest Sean and Kyle, and aimed his gun at Sean even though Sean was handcuffed and on the ground, all actions demonstrating willful and wanton behavior.

I find that Plaintiffs' contention that Ahlbrecht's withholding of information from his affidavits of probable cause demonstrates willful and wanton conduct to be without merit.  As discussed in section IV.C., *supra*, Investigator Ahlbrecht had probable cause to arrest Sean and Kyle, and the failure to pursue alibi claims does not exceed negligence.  *See, e.g.*, *Romero*, 45 F.3d at 1479.  However, Plaintiffs' other two contentions—that Ahlbrecht launched an unnecessary raid and that he aimed his firearm at Sean when Sean was handcuffed—could constitute willful and wanton conduct.  Taking the evidence in the light most favorable to the Plaintiffs, Ahlbrecht spurned an opportunity to arrest Sean and Kyle without incident when Mr. Sumpter offered to bring them to the Sheriff's station.  His decision to instead lead a multi-officer raid to arrest the boys at their house patently involved more risk to the Sumpters.  Moreover, one could infer from the decision an intent to embarrass or punish Sean and Kyle.  *See Moody*, 885 P.2d at 205.  In addition, once Sean was handcuffed and on the ground, he was clearly no longer a threat, yet Ahlbrecht continued to aim his weapon at him.  Such conduct could be considered "wholly disregardful of the rights, feelings and safety of others," *see id.*, and it implies an intent to punish Sean.  Sean's status as a

minor at the time aggravates these concerns.  Accordingly, I find that Plaintiffs have offered sufficient evidence to support a finding of willful and wanton conduct on the part of Ahlbrecht, and thus, he is not entitled to governmental immunity under the CGIA. *See* Colo. Rev. Stat. § 24-10-118(1).  For this reason, summary judgment in favor of Ahlbrecht based on governmental immunity is not appropriate in connection with Plaintiffs' tort claims.

2. <u>Intentional Infliction of Emotional Distress Claim Asserted Against Defendant Ahlbrecht</u>

To bring a claim of intentional infliction of emotional distress in Colorado, a plaintiff must establish that (1) the defendant engaged in extreme and outrageous conduct, (2) the defendant did so recklessly or with the intent of causing the plaintiff severe emotional distress, and (3) the defendant's conduct caused the plaintiff severe emotional distress.  Colorado Jury Instructions, 4th – Civil  [hereinafter CJI] 23:1 (2011). "Extreme and outrageous conduct is conduct that is so outrageous in character, and so extreme in degree, that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a civilized community." *Id.* at 23:2.  "[T]he totality of conduct . . . must be evaluated to determine whether outrageous conduct has occurred." *Zalnis v. Thoroughbred Datsun Car Co.*, 645 P.2d 292, 294 (Colo. App. 1982).  "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994).

Ahlbrecht argues that his conduct was reasonable and therefore, does not constitute extreme and outrageous conduct.  Plaintiffs, alleging that Ahlbrecht withheld information from affidavits of probable cause, caused an unnecessary raid to occur, and pointed his firearm at Sean when Sean was already handcuffed, argue that Ahlbrecht's conduct was atrocious.  Taking the evidence in the light most favorable to the Plaintiffs, I find that reasonable people could disagree as to whether Ahlbrecht's conduct was extreme and outrageous.  *See id.*  An unnecessary raid to arrest two minors, combined with aiming a firearm at a minor that no longer posed a threat, could be considered conduct that is "utterly intolerable in a civilized community."  *See* CJI 23:2.  Thus, a jury should determine this issue, and summary judgment in favor of Ahlbrecht is not appropriate on Plaintiffs' intentional infliction of emotional distress claim.

3.    Assault Claim Asserted Against Defendant Ahlbrecht

In Colorado, a claim for assault requires a showing that: (1) the defendant intended to cause an offensive or harmful physical contact with the plaintiff or intended to place the plaintiff in apprehension of such contact; (2) the defendant placed the plaintiff in apprehension of immediate physical contact; and (3) that contact appeared to be harmful or offensive.  CJI 20:1.  Ahlbrecht argues that there is no evidence that he approached or made physical contact with Sean.  While this may be true, the elements of assault require neither an approach nor physical contact.  *See id.*  Based on the allegation that Ahlbrecht pointed his gun at Sean once Sean was handcuffed and on the ground, I find that Plaintiffs could satisfy all three elements of Sean's assault claim.  Summary judgment on this claim is therefore inappropriate at this time.

4.   Battery Claim Asserted Against Defendant Ahlbrecht

To bring a claim of battery in Colorado, a plaintiff must show that: (1) the defendant's act resulted in physical contact with the plaintiff; (2) the defendant intended to make harmful or offensive physical contact with the plaintiff or knew that he would probably make such contact; and (3) the contact was harmful or offensive.  CJI 20:5. Ahlbrecht correctly points out that because he did not have any physical contact with Sean, Plaintiffs cannot satisfy the first element of battery.

Plaintiffs argue that Ahlbrecht's role in leading the investigation led to physical contact as Sean was thrown to the floor, handcuffed, and detained.  In effect, Plaintiffs urge me to find that any person who helps set in a motion a series of events that eventually leads to physical contact can be liable for battery.  Unsurprisingly, Plaintiffs direct me to no authority supporting this argument, and I know of none.

Rather, battery claims require that the defendant actually touch plaintiff or cause another object to touch plaintiff.  *See, e.g.*, *Micalizzi v. Ciamarra*, 206 F. Supp. 2d 564, 582 (S.D.N.Y. 2002) (dismissing battery claim where defendant never touched plaintiff); *Mooney v. Carter*, 160 P.2d 390, 392 (Colo. 1945) (stating that "[t]o constitute [a battery] it is enough wilfully to set in motion a force which in its ordinary course causes an injury," and finding a battery where a defendant intentionally swerved her car to throw a police officer from the running board).  While the term "resulted in" in the jury instruction almost assuredly encompasses direct or indirect applications of force, the term cannot connote but-for causation without proximate causation.  *See Mooney*, 160 P.2d at 392; 6A C.J.S. *Assault* § 12 (2011) (stating that battery can occur through direct or indirect contact so long as the force applied is the proximate cause).  Examples of indirect

applications of force include where a bullet strikes a victim or where an employer vents

pollution into an area where an employee is working.  6A C.J.S. *Assault* § 12 (2011).

Here, I find that leading an investigation that eventually causes another officer to have

physical contact with Sean cannot be considered a direct or indirect application of force.

*See id.*  Thus, Plaintiffs cannot satisfy the first element of battery, and summary

judgment shall be entered in favor of Defendant Ahlbrecht on this claim.

E.      Plaintiffs' Failure to Train Claim

Plaintiffs assert that Defendant Elbert County, specifically Lt. Nail and Officer

Heap, failed to train and/or supervise employees and also lacked policies resulting in

constitutional violations.

To prevail on a claim for failure to train police officers in the use of force, a

plaintiff must first prove that the training was, in fact, inadequate.  *Carr v. Castle*, 337

F.3d 1221, 1228 (10th Cir. 2003).  The plaintiff must then satisfy the following elements:

> (1) the officers exceeded constitutional limitations on the use
> of force; (2) the use of force arose under circumstances that
> constitute a usual and recurring situations [sic] with which
> police officers must deal; (3) the inadequate training
> demonstrates a deliberate indifference on the party [sic] of
> the city toward persons with whom the police officers come
> into contact, [sic] and (4) there is a direct causal link
> between the constitutional deprivation and the inadequate
> training.

*Id.* (quoting *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000)).  Defendants claim

that Plaintiffs have failed to come forward with any evidence showing that (1) the

Sheriff's Office's training was inadequate or (2) the training demonstrated deliberate

indifference.  I agree.

1.     Whether Training Was Inadequate

Plaintiffs have not alleged that a particular Sheriff's Office policy is unconstitutional.  "In a failure to train case where . . . the policy itself is not unconstitutional, a single incident of excessive force can establish the existence of an inadequate training program *if* there is some other evidence of the program's inadequacy."  *Brown*, 227 F.3d at 1286 (emphasis added).  In this case, Plaintiffs have sufficiently alleged an incident of excessive force but have provided no other evidence that the Sheriff's Office's training was inadequate.  Although Plaintiffs' expert Dennis Waller states that the Defendant Officers' actions "which were inconsistent with written directives, and the failure of the agency to take notice and remedial action, are consistent with the failure to train and supervise personnel," (Ex. 11 at 7, ECF No. 78-11), this statement does no more than express the truism that poor officer conduct implies poor training or supervision.  As such, I find that it does not constitute "other evidence" of training inadequacies.  *See Brown*, 227 F.3d at 1286-87 (finding sufficient "other evidence" where a training commander identified a specific training policy, an expert witness testified about the inherent risks of the policy, and the defendant officer testified that he felt "ill-equipped" for the situation the policy was designed to address).  In addition, I find that Plaintiffs' arguments that "[t]here was a clear failure to train the officers in the proper use of force" and that "[h]ad the officers been properly trained in the use of force on minors . . . the violations herein would never have occurred" (Resp. at 25-26), do not constitute "other evidence" of training inadequacy.  *See Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) ("the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment").  For

these reasons, I conclude that Plaintiffs have not sufficiently established that the Sheriff's Office training was inadequate.

### 2.   Deliberate Indifference

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).   Although notice is normally established by proving a pattern of tortious conduct, deliberate indifference may be found absent a pattern of unconstitutional behavior "if a violation of federal rights is a 'highly predictable' or 'plainly obvious' consequence . . . such as when a municipality fails to train an employee in specific skills needed to handle recurring situations[.]"  *Id.* at 1307-08 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997); *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

Plaintiffs have provided no evidence that the Sheriff's Office or Elbert County had actual or constructive notice that the alleged failure to train officers in the use of force on minors was substantially certain to result in a constitutional violation.  *See Barney*, 143 F.3d at 1307.  In their Response, Plaintiffs' only support in favor of finding deliberate indifference is the statement that "[s]uch inadequate training demonstrates deliberate indifference of the municipality towards the person with whom officers come into contact."  (Resp. at 26.)  This is merely a recitation of an element of a failure to train claim and thus, provides no evidence that Defendants had actual or constructive notice that the alleged failure to train would most likely result in a constitutional violation, let alone that Defendants deliberately chose to ignore any risk of harm.  Plaintiffs have

come forward with no evidence of any previous incidents involving the Sheriff's Office and excessive force claims brought by minors.  Accordingly, I conclude that Plaintiffs cannot show actual or constructive notice, through a pattern of tortious conduct, that Sheriff's Office training was substantially certain to result in a violation of Sean's constitutional rights.

Nor am I persuaded that the alleged training inadequacies make it "highly predictable" or "plainly obvious" that constitutional violations would result.  *See Barney*, 143 F.3d at 1307-08.  Common sense indicates that regular training on the use of force—such as the Sheriff's Office policy requiring officers to "exhaust every reasonable means of apprehension before resorting to use of firearms," (Ex. 3 at 5)—would encompass situations involving the use of force on minors, thus leaving no gaping hole in the training program regarding the use of force.  Plaintiffs have provided no evidence that the absence of policies or procedures relating to the use of force on minors is contrary to best practices or national standards.[19]  Overall, the insufficiency of Plaintiffs' allegations of deliberate indifference stand in stark contrast to Tenth Circuit case law

---

[19] Plaintiffs also note that the Sheriff's Office had "no policies for investigating sex crimes[.]"  (Resp. at 26.)  In concluding that Investigator Ahlbrecht and Lt. Nail improperly conducted their investigation, Plaintiffs' expert Dennis Waller wrote:

> The information utilized by investigative personnel to obtain an arrest warrant was based entirely on the statements of the alleged victim . . . . "The uniqueness of sex crime investigations is that they often require more than just the testimony of the victim . . . If we allow investigators to make arrests without building a case or developing sufficient evidence to prosecute, we do a disservice . . . ."

(Ex. 11 at 6-7) (quoting Thomas P. Carney, *Practical Investigations of Sex Crimes* 25 (2004)).  Even assuming Mr. Waller's statement is sufficient to establish an inference that the absence of policies for investigating sex crimes makes it plainly obvious that constitutional violations would result, I find that the absence of such a policy does not establish a "direct causal link" to Sean's constitutional deprivation.  *See Carr*, 337 F.3d at 1228; *see also Barney*, 143 F.3d at 1307 (noting that "rigorous standards of culpability and causation must be applied" in situations where a policy is lawful on its face and the municipality has not directly inflicted the injury).  I find that the absence of policies for investigating sex crimes is simply unrelated to the application of excessive force in this case.

finding a sufficient showing of deliberate indifference.  *See, e.g.*, *Allen v. Muskogee*, 119 F.3d 837, 842-43 (10th Cir. 1997) (finding permissible inference of deliberate indifference where expert stated that a specific policy was totally contrary to national standards and training officer testified that defendant officers acted properly under the policy).  Thus, I find that Plaintiffs cannot establish the element of deliberate indifference.

Accordingly, because Plaintiffs have not provided sufficient evidence to sustain a finding that Defendants' training was inadequate or that Defendants were deliberately indifferent, summary judgment in favor of Defendants is proper on Plaintiffs' failure to train claim.

      F.    <u>Plaintiffs' Intentional Interference Claim</u>

Plaintiffs George and Kathleen Sumpter assert a due process violation under the 14th Amendment against all Defendants.

Under § 1983, parents may bring a claim based on a deprivation of their constitutional right to the freedom of intimate association with their children.  *Trujillo v. Bd. of Cnty. Comm'rs of the Cnty. of Santa Fe*, 768 F.2d 1186, 1188 (10th Cir. 1985).  "Not every statement or act that *results* in an interference with the rights of intimate association is actionable," however.  *Griffin v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993).  The Tenth Circuit has held that "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required to state a claim under section 1983."  *Trujillo*, 768 F.2d at 1190; *see also Bryson v. City of Edmond*, 905 F.2d 1386, 1394 (10th Cir. 1990) (requiring "specific intent on the part of the defendants to deprive the plaintiffs of their rights of association").  Such intent is

shown by establishing that the defendants "directed" their conduct or statements "at the intimate relationship with knowledge that the statements or conduct will adversely affect that relationship." *J.B. v. Washington Cnty.*, 127 F.3d 919, 927 (10th Cir. 1997).

Defendants argue both that there is no evidence that they directed their conduct at the Sumpters' parent-child relationship and that Mrs. Sumpter admitted that Defendants did not intend to interfere with her parental relationship with Sean and Kyle. I disagree. Taken in the light most favorable to Plaintiffs, the evidence could support an inference that Defendants had the "specific intent" to interfere with Mr. and Mrs. Sumpter's parental relationship with their sons. *See Bryson v. City of Edmond*, 905 F.2d 1386, 1394 (10th Cir. 1990). Investigator Ahlbrecht refused Mr. Sumpter's offer to bring Sean and Kyle to the Sheriff's station without contingency, and instead led a multi-officer raid on the Sumpter residence. Once Sean was handcuffed, Officers told him to tell Mrs. Sumpter what he had done. (Ex. I at 85:12; *see also* Ex. 2 at ¶ 5.) When Mrs. Sumpter asked Investigator Ahlbrecht why her son was being arrested, he "kept saying, [a]sk your son, ask your son. It was ridiculous." (Ex. 8 at 72:9-10.) When asked whether Investigator Ahlbrecht's actions were designed to disrupt her relationship with her sons, Mrs. Sumpter responded, "He was talking in a very evil kind of voice. . . . Every time I would ask, Why are you doing this; what's going on, he would just shoot back, Ask your son; Sean, tell her what you did. I mean, that went round and round and round. He was vicious." (Ex. D at 144:1-8.) I find that Sean and Kyle could have been arrested without the raid and without the verbal taunts; that the Defendants chose not do so permits an inference that they specifically intended to interfere with Mr. and Mrs.

Sumpter's parental relationship with their sons by purposefully exacerbating the negative effects of the arrest.

I further note that the fact that Mrs. Sumpter stated that Officers Heap and Dixon were not trying to sabotage her relationship with her sons does not change my analysis. Although this answer standing alone might be fatal to Plaintiffs' intentional interference claim, Mrs. Sumpter was asked essentially the same question about different Officers and she responded by stating either that she did not understand the question or that an Officer was "vicious."  (Ex. D at 143:7-8) ("I don't understand how [Sheriff Frangis] would do that. . . . I am not sure what you mean"); (Ex. D at 143:20-22) ("I don't know how a policeman is going to try to get in between a relationship.  I don't understand that question" (referring to Sgt. Peterson)); (Ex. D at 144:8) ("[Investigator Ahlbrecht] was vicious").  Thus, I conclude that Mrs. Sumpter's deposition testimony does not defeat an inference that Defendants directed their conduct at Mr. and Mrs. Sumpter's relationship with Sean and Kyle.  After reviewing the totality of the evidence, I find that summary judgment in favor of Defendants on Plaintiffs' intentional interference claim is not proper at this time.[20]

V.    CONCLUSION

Based on the foregoing, it is

ORDERED that Defendants Frangis, Peterson, Dixon, Heap, Mattive, Elbert County Sheriff's Office and Elbert County's Motion for Summary Judgment (ECF No. 70) is **DENIED** with respect to Plaintiffs' first claim for relief (Unlawful Search and

---

[20] I am cognizant of the possibility that there is no evidence that certain Defendants—particularly Officers Heap and Dixon—intended to interfere with Mr. and Mrs. Sumpter's relationship with Sean and Kyle. However, the parties failed to distinguish between different Defendants in their briefing, and I am unwilling to decide whether particular Defendants are entitled to summary judgment on this claim.

Seizure and Excessive Force), Plaintiffs' second, fourth, and fifth claims for relief
(Intentional Infliction of Emotional Distress, Assault, and Battery), and Plaintiffs' tenth
claim for relief (Violation of Due Process – 14th Amendment).  The motion is **GRANTED**
with respect to Plaintiffs' eighth claim for relief (Unlawful Search and Seizure –
Malicious Prosecution) and Plaintiffs' ninth claim for relief (Failure to Train and/or
Supervise Employees and Lack of Policies Resulting in Constitutional Violations).
Accordingly, judgment shall be entered in favor of Defendants Frangis, Peterson, Dixon,
Heap, Mattive, Elbert County Sheriff's Office and Elbert County on Plaintiffs' eighth and
ninth claims for relief.  It is

FURTHER ORDERED that Defendant Albrecht's [sic] Motion for Summary
Judgment (ECF No. 68) is **DENIED** with respect to Plaintiffs' first claim for relief
(Unlawful Search and Seizure and Excessive Force), Plaintiffs' second, third, and fourth
claims for relief (Intentional Infliction of Emotional Distress, Abuse of Process, and
Assault), and Plaintiff's tenth claim for relief (Violation of Due Process – 14th
Amendment).  The motion is **GRANTED** with respect to Plaintiffs' eighth claim for relief
(Unlawful Search and Seizure – Malicious Prosecution) and Plaintiffs' fifth claim for
relief (Battery).  Accordingly, judgment shall be entered in favor of Defendant Ahlbrecht
on Plaintiffs' eighth and fifth claims for relief.

Dated:  January 26, 2012

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge